IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THOMAS EDWARD JONES, #140289,   )
                                    )
         Plaintiff,          )
                                    )
    v.                     )     CASE NO. 2:12-CV-786-WHA
                                    )           [WO]
                                    )
CORIZON, et al.,             )
                                    )
        Defendants.       )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Thomas Edward Jones ("Jones"), an elderly state inmate, challenging the adequacy of medical treatment provided to him for his sinusitis, loss of vision in his left eye and a gastrointestinal issue during his confinement at the Easterling Correctional Facility ("Easterling").  Jones also challenges the co-payment charged to him for sick call requests submitted seeking treatment for his sinus condition.  Jones names Corizon, the contract medical care provider for the Alabama Department of Corrections, Dr. Jean Darbouze, a physician at Easterling, Kay Wilson, a registered nurse who serves as the Health Services Administrator for Easterling, and Carol Edwards, listed by the plaintiff as Mrs. Edward, a Certified Registered Nurse Practitioner at Easterling, as defendants in this cause of action.  Jones seeks monetary damages and injunctive relief for the alleged violations of

his constitutional rights.

The defendants filed special reports, supplemental special reports and relevant supporting evidentiary materials, including affidavits and medical records, addressing Jones' claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to construe the aforementioned reports as a motion for summary judgment. *Order of October 30, 2012 - Doc. No. 16*; *Order of March 1, 2013 - Doc. No. 51*.  The plaintiff likewise submitted motions for summary judgment.  *See Doc. No. 69* and *Doc. No. 70*.  Thus, this case is now pending on the motions for summary judgment filed by the parties.

Upon consideration of these motions, the evidentiary materials filed by the parties in support thereof, the sworn complaint, and the verified responses of the plaintiff, the court concludes that the defendants' motion for summary judgment is due to be granted and the plaintiff's cross motions for summary judgment are due to be denied.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims of deliberate indifference presented by the plaintiff.  Based on the foregoing, the plaintiff must establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or

---

[1]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment [to a party] if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, the opposing party "must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when a party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted.  *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities [and correctional medical personnel].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal

citation omitted).  Consequently, to survive the defendants' properly supported motion for summary judgment, Jones is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of deliberate indifference. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*.  "If the evidence [on which the plaintiff relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment in favor of the defendants appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without

5

specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the defendants.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of [the plaintiff's] case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record .... [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists." *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only

factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the [plaintiff], there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the plaintiff must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*,

548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11ᵗʰ Cir. 1990).

Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Jones has failed to demonstrate a genuine dispute of material fact as to the issue of deliberate indifference in order to preclude entry of summary judgment in favor of the defendants. *Matsushita*, *supra*.

## III. DISCUSSION[2]

### A. Deliberate Indifference

Jones asserts that after his transfer to Easterling in April of 2011 the defendants have denied him adequate medical treatment for recurring sinus infections and a sudden loss of vision in his left eye which occurred on or about May 31, 2012. *Complaint - Doc. No. 1* at 3. Jones further alleges that in May of 2012 the defendants acted with deliberate indifference to a gastrointestinal issue arising from his acute gastritis. *Attachment to the Complaint - Doc. No. 1-1* at 5.

The defendants adamantly deny they acted with deliberate indifference to Jones'

---

[2]The court limits its review to the allegations set forth in the complaint filed by Jones. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11ᵗʰ Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 Fed. App'x 905, 909-910 (11ᵗʰ Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11ᵗʰ Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint). Consequently, if the plaintiff seeks to challenge the constitutionality of medical treatment provided to him for a skin condition contracted in 2014, *Plaintiff's June 16, 2015 Response - Doc. No. 78* at 4, he may do so by filing a separate 42 U.S.C. § 1983 action.

medical needs. In support of this assertion, the defendants maintain that they routinely evaluated Jones regarding his numerous health issues, provided medical treatment to Jones for both his sinus problems and degenerative eye conditions in accordance with their professional judgment, referred Jones to the on-site optometrist for assessment and also scheduled Jones appointments with free-world ophthalmologists on September 14, 2012 and October 12, 2012 for additional evaluations.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment."

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir.1995). Instead, something more must be shown. Evidence must support a conclusion that a prison

physician's harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need ..., Plaintiff[] must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he

must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d

164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not

just knowledge of symptoms, and ignore known risk to serious condition to warrant finding

of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk

that he should have perceived but did not, while no cause for commendation, cannot under

our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate
> indifference, ... the Supreme Court has ... emphasized that not 'every claim
> by a prisoner that he has not received adequate medical treatment states a
> violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at
> 291; *Mandel,* 888 F.2d at 787. Medical treatment violates the eighth
> amendment only when it is 'so grossly incompetent, inadequate, or excessive
> as to shock the conscience or to be intolerable to fundamental fairness.'
> *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence
> or malpractice do not rise to the level of constitutional violations. *See*
> *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not
> become a constitutional violation merely because the victim is a prisoner.');
> *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not
> sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033
> (mere medical malpractice does not constitute deliberate indifference). Nor
> does a simple difference in medical opinion between the prison's medical
> staff and the inmate as to the latter's diagnosis or course of treatment support
> a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033
> (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation

and internal quotations omitted) (To show deliberate indifference to a serious medical

need, a plaintiff must demonstrate that the defendants' response to the need was more than

"merely accidental inadequacy, negligence in diagnosis or treatment, or even medical

malpractice actionable under state law."). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

The evidentiary materials filed by the defendants address the claims made by Jones alleging a lack of adequate medical treatment. A thorough review of these documents demonstrates that the affidavits submitted by the defendants are corroborated by the objective medical records compiled contemporaneously with treatment provided to Jones relative to the instant claims of deliberate indifference.

During his periodic health assessment on May 28, 2011, a Snelling Eye Exam was

performed to determine Jones' visual acuity.  The results of this examination demonstrated

(i) uncorrected vision of 20/150 in the right eye, 20/200 in the left eye and 20/70 for both

eyes, and (ii) corrected vision of 20/50 in the right eye, 20/70 in the left eye and 20/50 for

both eyes.  *Defendants' Exhibit B to the Special Report - Doc. No. 9-2* at 10.[3]  The periodic

visual acuity examination conducted on May 30, 2012, the day before Jones complained

of lost vision in his left eye, demonstrated (i) uncorrected vision of 20/70 in the right eye,

20/100 in the left eye and 20/100 for both eyes, and (ii) corrected vision of 20/25 in the

right eye, 20/40 in the left eye and 20/25 for both eyes.  *Id*.  These results in conjunction

with the allegations made by Jones indicate that he suffered a sudden and total loss of

vision in his left eye on May 31, 2012.

In his initial affidavit, Dr. Darbouze, a board certified internist, addresses Jones'

allegations, in pertinent part, as follows:

> Since being incarcerated at the Easterling Correctional Facility, Jones
> has been seen on numerous occasions at the Health Care Unit regarding his
> alleged sinus related problems.
>
> On May 11, 2012, three x-ray views were taken of Jones' paranasal
> sinuses.  The radiological findings were as follows:
>
> > Three radiographs of the patient's sinuses and skull are
> > provided.  Maxillary sinuses are clear.  There is opacification
> > of the right portion of the frontal sinus, which could be due to
> > non-aeration, but I cannot exclude sinus disease.  Correlate for
> > right frontal pain.  Left frontal sinus is clear.  Sphenoid sinus
> > is clear on the lateral view.  Bones and soft tissues are

---

[3] The following medical abbreviations are relevant to this case:  OD - right eye, OS - left eye and OU - both eyes.

otherwise unremarkable.
Impression:
      1.  Maxillary sinuses are clear.
      2.  There is opacity in the right frontal sinus, which could represent sinus disease or non-aeration in this area.  Correlate for right frontal pain.

Subsequent to the x-rays, Jones was treated with medication for sinuses.

Follow-up x-rays were taken on September 19, 2012.  The results from the three x-rays taken on September 19, 2012, were as follows:

Results:  Sinus series comparison:  none.
Findings:  Anatomic alignment is maintained.  There was no acute fracture or dislocation.  The soft tissues are unremarkable.  There are no erosive changes seen.  No air-fluid levels or mucoperiosteal thickening is seen.
Conclusion:  No acute sinus disease.

Furthermore, an MRI was taken of Jones' brain on September 24, 2012.  The MRI results were as follows:

MRI of the brain:  Technique:  Multiplanar multiecho MR of the brain without and with intravenous Gadolinium contrast.
Findings: Diffusion weighted sequence appears unremarkable. The cisterns and ventricles are patent.  There is age-related atrophy.  There is T2 hyper intensity in the periventricular and subcortial white matter that appears to be areas of chronic small vessel ischemic change.  No mass, mass effect, midline shift, hemorrhage or extra-axial fluid collections.
Impression: Atrophy in chronic small vessel ischemic changes.

[On June 8, 2102, Jones completed a sick call request form in which he advised that his "sinus[es] are infected and now I am completely blind in my left eye where the infection is." *Defendants' Exhibit B - Doc. No. 9-2* at 54].  The nurses' notes ... indicate that Jones was seen in the Health Care Unit [on June 9, 2012 regarding these complaints].

["On September 5, 2012, Mr. Jones was seen by an optometrist at the Easterling Correctional Facility.  Thereafter, a consultation request was made for Jones to be seen by an ophthalmologist.  The consultation request for an ophthalmologist was approved on September 10, 2012." *Defendants' Exhibit A to the Second Supplemental Special Report - Doc. No. 48-1* at 2.]

On September 14, 2012, Jones was seen by outside consultant Ram R. Peddada, M.D.  The impression noted by Dr. Peddada was as follows:

> 1. Ischemic optic neuropathy, OS-FA-OA [left eye outer segment Fluorescein angiography of ophthalmic artery] transit/FP (risk and benefits discussed).  Patient wishes to proceed.  Patient tolerated FA shows no leakage in retina or disk.  Patient to follow up with primary medical doctor for thorough work-up (heart, lung, hypertension) for anterior Ischemic Optic Neuropathy.
> 2. Vitreous detachment OU-RD warnings given.
> 3. Cataract, combined, OU-OD-OS.  Patient to see Dr. Bennett for cataract evaluation and surgery.

Cataract surgery has been scheduled for Jones with Dr. Bennett at the Eye Center South.

Jones' cataracts [and Ischemic Optic Neuropathy] are totally unrelated to any sinus-related issues Jones has.  There is no correlation between Jones' prior sinus problems and his current [vision issues].

Jones has never been denied or delayed medical care.  Each time Jones has sought medical care at the Easterling Correctional Facility, he has been seen and treated for his medically necessary conditions.

*Defendants' Exhibit A to the Special Report - Doc. No. 9-1* at 3-5.

In addressing Jones' claims regarding his sinus condition and gastrointestinal issues

related to medication prescribed to him, Dr. Darbouze asserts that:

Mr. Jones was scheduled an appointment to see me on April 30, 2012, from a previous sick call visit that he had at the health care unit on April 24,

15

2012.  Mr. [Jones] explained to me on that occasion that he had diarrhea for a week although [he] denied any abdominal pain.  The lab work [previously ordered and performed] was negative and he was seen and evaluated by me on that occasion.

Mr. Jones was thereafter seen, examined and treated by me on May 9, 2012 with a diagnosis of acute sinusitis with early abscess to the left nostril.  Mr. Jones was prescribed Bactrim DS and Naproxen with a follow up appointment on May 11, 2012.

From that appointment, Mr. Jones was scheduled another follow-up appointment on May 14, 2012.  At this appointment it was noted the area was healed to the left nostril and Naproxen was discontinued.

On May 17, 2012, Mr. Jones came to the Health Care Unit "HCU" stating that his stomach was hurting, complaining of nausea, and vomiting the night before and stating that his last bowel movement was black.  Mr. Jones was examined by me and the test indicated his stool was positive for blood.  I diagnosed Mr. Jones with acute gastritis likely related to the Naproxen he had been taking until two days prior.

Mr. Jones was admitted to the infirmary, lab work was ordered and taken, and an abdominal x-ray was taken.  Mr. Jones was prescribed [an] IV and medications pursuant to orders from me.

Pursuant to the results of the CBC, generalized weakness, and stools continuing to be dark, Mr. Jones was sent to the Jackson Hospital ER, pursuant to an order from me to be evaluated for upper GI bleeding.  [He returned to Easterling Correctional Facility on May 30, 2012.  *Defendants' Exhibit C to the Special Report - Doc. No. 9-3* at 32.]  Mr. Jones continues to be followed by me at the Easterling Correctional Facility [for the gastrointestinal issue].

*Defendants' Exhibit A to the First Supplemental Special Report - Doc. No. 15-1* at 2-3.

Dr. Darbouze filed an additional supplemental affidavit in which he further

addresses the gastrointestinal issue suffered by Jones in mid-2012 and the current status

of his sinus condition.  This affidavit, with respect to the treatment provided to Jones' for

his acute gastritis, reads as follows:

Mr. Jones was scheduled for an appointment to see me on April 30, 2012, from a previous sick call visit that he had at the health care unit on April 24, 2012.  Mr. Jones explained to me on that occasion that he had diarrhea for approximately a week although he denied any abdominal pain. Lab work was ordered which was negative [- *see Defendants' Exhibit A to the Fourth Supplemental Special Report - Doc. No. 75-1* at 14-15,] and Mr. Jones was seen and evaluated by me on that occasion.

The medical records attached hereto show that on May 1, 2012, a special needs communication form was completed pertaining to Mr. Jones. Mr. Jones was allowed to report to the health care unit for a stool specimen collection [to aid in the diagnosis of his condition - *Id*. at 13].

I saw Mr. Jones on May 8, 2012 and ordered a series of medications [including Chlor-trimetron or CTM, an antihistamine, Guaifenesin, cough syrup, Tylenol and antibiotics to treat Mr. Jones' complaints of a sinus infection and nasal abscess - *Id*. at 11].

Further medications were ordered for Mr. Jones on May 9, 2012, as well as a series of x-rays [of his sinuses - the results of which showed that his maxillary sinuses and left frontal sinus were clear].  I personally saw and evaluated Mr. Jones on May 9, 2012, and performed a physical examination due to Mr. Jones' complaints of softness and tenderness in his abdomen [- *Id*. at 16].

On May 11, 2012, I again saw Mr. Jones at the Health Care Unit at the Easterling Correctional Facility [for a follow-up on his nasal abscess - *Id*. at 27].

Medical records reveal that further medications were ordered for Mr. Jones by me again on May 11, 2012 [Tylenol] and May 14, 2012 [Reglan and Prilosec - medications used in the treatment of gastrointestinal issues].  I personally saw and evaluated Mr. Jones again on May 14, 2012 [- *Id*.].

On May 17, 2012, a body chart was completed by a registered nurse due to Mr. Jones' complaints of abdominal pain.  Mr. Jones subjective description of his medical issues were recorded by the nurse as follows:

> My stomach is hurting me and I'm nauseated.  I threw up black stuff last night and the night before.  I can't go to the bathroom either.  The last bowel movement I had was Monday and it was just a little black looking stuff.

[The nurse examined Jones and noted that bowel sounds were present in all four quadrants, his abdomen was "soft & non-distended" with some "tenderness to touch" and nausea but no "vomiting at present.  *Id*. at 43]. The nurse made an appointment for Mr. Jones to be seen by the medical doctor.

Also, on May 17, 2012, Mr. Jones was placed on a clear liquid diet.

The nurse's notes from May 17, 2012 indicated that Mr. Jones had been admitted to the infirmary [for observation, *id*. at 39,] and that Mr. Jones was lying quietly in the infirmary and voiced no acute distress at that time [*Id*. at 44.]

I personally saw Mr. Jones in the infirmary on May 17, 2012.  Mr. Jones had been complaining of abdominal pain and constipation.  He was provided medications [including Amoxil, Clarithromycin and an IV of Lactacted Ringer's ("LR"), *id*. At 42-46, 22] for his medical issues.

... [O]n May 17, 2012 ... labs were ordered through Troy Hospital. [*Id*. at 32-34.  A Helicobacter Pylori Test, a procedure to detect infection in the stomach and upper small intestine, was performed on this date with negative results.  *Id*. at 31.  The medical records further reflect that an x-ray of Jones' abdomen was performed on May 18, 2012 which showed:  "No abnormal calcifications or soft tissue masses....  The bowel gas pattern is normal without evidence of bowel dilatation or obstruction.  No subphrenic free air seen on upright view.  Conclusion: Unremarkable abdomen examination." *Id*. at 47.  Dr. Darbouze again examined Jones on the morning of May 18, 2012.  *Id*. at 45.  Based on this examination, Dr. Darbouze determined that Jones was suffering from "UGI Bleeding" and referred him

to Jackson Hospital for treatment. *Id*.]

On May 18, 2012, Mr. Jones was transferred to Jackson Hospital [pursuant to Dr. Darbouze's order] due to GI bleeding.

On May 18, 2012, Mr. Jones was admitted to Jackson Hospital.... His admitting diagnoses were (1) gastrointestinal bleeding (2) blood loss anemia (3) history of peptic ulcer disease (4) hypertension and (5) benign prostate hypertrophy. After being treated at Jackson Hospital, Mr. Jones' condition was noted as - improved.

Mr. Jones was housed in the infirmary [at Easterling upon his complaints of abdominal pain, vomiting and discolored stools] and ... transferred to Jackson Hospital in Montgomery for treatment. Mr. Jones was admitted into Jackson Hospital on May 18, 2012 and discharged on May 21, 2012. Mr. Jones' gastrointestinal bleeding was treated and controlled by the physicians at Jackson Hospital.

*Defendants' Exhibit A to the Fourth Supplemental Special Report - Doc. No. 75-1 at 2-4.*

The attending physician at Jackson Hospital discharged Jones to the custody of correctional officials on May 21, 2012. At this time, Jones was transported to Kilby Correctional Facility and admitted to the infirmary at this facility. *Id*. at 54. Upon initial examination of Jones, a nurse found no abnormalities in his physical condition but noted his "hesitancy & urgency [with] urination." *Id*. Dr. Doshi prescribed medications for Jones in accordance with the instructions of the physician at Jackson Hospital. *Id*. at 70-71, 75. These medications included Aspirin, Cardura, HCTZ (hydrochlorothiazide), Prilosec, Maalox and Reglan. *Id*. On May 22, 2012, Jones advised the nurse that he was "not in any pain & [had] not noticed any bleeding in [his] stool." *Id*. at 72. The following

day, Jones had "no verbal complaints" and "denie[d] any bleeding at present. Abd[omen] soft non-distended [with bowel sounds] in 4 quads." *Id*. Upon his transfer to Easterling on May 30, 2012, Jones was admitted into the infirmary for continued monitoring of his condition. *Id*. at 88-89. Medical personnel at Easterling likewise continued to provide Jones with his prescribed medications.

Dr. Darbouze personally examined Jones on May 30, 2012 at which time Jones had no complaints regarding his gastrointestinal condition. *Id*. at 5, 90. Jones also underwent a rectal examination on this date. *Id*. at 90. Dr. Darbouze further states that:

> From the time that Mr. Jones first complained of stomach issues and diarrhea beginning on April 24, 2012 until the end of May 2012, he was repeatedly seen and treated due to his gastrointestinal issues.

> Mr. Jones was seen almost daily by either myself or by nurses at the Easterling Correctional Facility with regard to his acute gastritis.

> At no time was Mr. Jones ever treated with deliberate indifference with regard to his gastrointestinal issues or his claims of "diarrhea and passing black stuff." The medical records reveal the medical treatment that Mr. Jones received during May of 2012 regarding his gastrointestinal issues. Mr. Jones' medical care was at no time denied and/or delayed.

> I am also aware that Mr. Jones has made claims that his medical records, including x-rays and MRI reports have been falsified....

> X-ray reports and MRI reports are drafted by physicians outside of the correctional facility. The medical staff inside the correctional facility have no way to change and/or alter the MRI reports or the x-ray reports received from the radiologists.

> *       *       *

As can be seen from the attached MRI and x-ray reports, any alteration or falsification could be clearly seen by the Court.  Any claims that Mr. Jones' medical records, x-ray reports, MRI report[] or any other medical documentation have been falsified or changed is adamantly and one hundred percent denied.

*  *  *

[With respect to the current status of Jones' sinus condition, his] medical chart from January 1, 2015 through to the present time [has been submitted as an exhibit - *Doc. No. 80* at 3-11] including all relevant information pertaining to Mr. Jones' sinus condition, treatment and medications.

*  *  *

On January 26, 2015, Mr. Jones completed a sick call request stating: "I need cold or flu medication.  I have a very bad cough in my chest and sinus running.  I also need to renew the Tylenol I was taking for arthritis to take as needed."

Mr. Jones was seen and assessed by a nurse at the Easterling Correctional Facility Health Care Unit.  Mr. Jones' temperature was 96.5, pulse was 85, respirations were 18, and blood pressure was 142/76.  Mr. Jones' oxygen saturation was 97%.  Mr. Jones only complaint [at the time of examination] was that of a cough.  He did not complain of any nasal congestion, sore throat or headache.

Mr. Jones completed another sick call request on February 4, 2015.  At that time, Mr. Jones stated: "I still have a very bad cold or the flu.  My cough is worse than ever and bright yellow mucus is coming out when I blow my nose."  Mr. Jones was seen and assessed by a nurse on the same date, February 4, 2015.  Mr. Jones temperature was 96.2, his pulse was 87, his respirations were 18, his blood pressure was 142/80 and his oxygen saturation level was 97%.  Mr. Jones was also seen by me and evaluated on that same date.  He was prescribed cold treatment for seven days.

The last time I saw Mr. Jones was on February 19, 2015.  Mr. Jones

21

was complaining of a cold and cough.  However, his vital signs were normal with his temperature at 98 degrees, his pulse at 84, his respirations at 18, his blood pressure at 160/90 and his oxygen saturation at 98 percent.  Due to Mr. Jones' ongoing complaints of cough and cold, I ordered an x-ray [of his chest].

The x-ray was taken on February 20, 2015.  The radiologist wrote on the radiology report as follows:

> The heart is normal in size and configuration.  The mediastinum [or space between the lungs] is normal without adenopathy [i.e., no swelling of the lymph nodes].  The lung fields are clear without mass, infiltrate, congestion or effusion.  Bony structures are unremarkable without acute fracture or destructive lesions.
> Conclusion:  No acute cardiopulmonary disease seen.  No change from [image of] March 11, 2013.

With the exception of complaining of having mild cold and cough symptoms, Mr. Jones has not complained of any sinus related issues at all in the year 2015.  Mr. Jones has complained of cold and cough like symptoms and has been prescribed medications for those symptoms.

Mr. Jones does not appear to be suffering from any sinus related problems that need current medical treatment at this juncture.

Mr. Jones continues to be seen at the health care unit at the Easterling Correctional Facility on a regular basis both by me as the health director at the Easterling Correctional Facility as well as the nursing staff.  Mr. Jones is seen regularly by the health care staff at Easterling and his health care at no time has ever been delayed or denied.

Each time Mr. Jones has sought medical care for any medical related issue [it is the opinion of Dr. Darbouze that] he has been seen and treated accordingly by myself and the nursing staff.

*Defendants' Exhibit A to the Fourth Supplemental Special Report - Doc. No. 75-1* at 5-8.

X-rays performed on May 11, 2012 indicated that Jones sinuses were clear. *Defendants' Exhibit D to the Special Report - Doc. No. 9-4* at 43. Although there was an opaque area in "the right portion of the frontal sinus," the radiologist found that the "[l]eft frontal sinus is clear. Sphenoid sinus is clear on the lateral sphere. Bones and soft tissues are otherwise unremarkable.... Maxillary sinuses are clear." *Id*. On May 30, 2012, upon Jones return to Easterling after receiving free-world treatment for his gastrointestinal condition, Jones underwent his periodic health assessment. The eye examination conducted at this time revealed slightly improved uncorrected vision in both of Jones' eyes. *Defendants' Exhibit B to the Special Report - Doc. No. 9-2* at 10. Jones alleges that the following day he suffered a sudden and complete loss of vision in his left eye. Jones maintains that he thereafter made several complaints to medical personnel, the first being on June 8, 2012, regarding his loss of vision which he attributed to his sinus condition. *Attachment to the Complaint - Doc. No. 1-1* at 9 ("This infection in the left side of my head has cause me to go blind in my left eye."). As previously referenced, x-rays of Jones taken on May 11, 2012 revealed clear sinus cavities. *Defendants' Exhibit D to the Special Report - Doc. No. 9-4* at 43. Additionally, x-rays of Jones' sinuses on September 19, 2012 were unremarkable and demonstrated "[n]o acute sinus disease." *Defendants' Exhibit D to the Special Report - Doc. No. 9-4* at 40. With respect to the x-ray of Jones' chest cavity taken on February 20, 2015 in response to his complaints of a chronic cough, the radiologist

determined that his lungs were clear.  *Defendants' Supplemental Exhibit - Doc. No. 80* at

11.

In a supplemental affidavit addressing Jones' allegation regarding the loss of vision

in his left eye, Dr. Darbouze provided the following information:

> On June 8, 2012, Mr. Jones made the following subjective comments
> to the nurse at the health care unit at the Easterling Correctional
> Facility: "My sinuses are infected again and now I am completely blind in my left eye
> where the infection is."  [The attending nurse referred Jones to the facility's
> physician for further evaluation.  *Defendants' Exhibit A to the Third
> Supplemental Special Report - Doc. No. 50-1* at 2, 4.]

> I saw Mr. Jones the following day, on June 9, 2012.  Mr. Jones' sinus
> complaints were completely unrelated to any vision problems that Mr. Jones
> was having.  On June 9, 2012, I personally prescribed medications for Mr.
> Jones' sinus issues.  Mr. Jones vision problems were not causing him any
> immediate medical problems and were not considered by me to be an
> emergency medical condition.  [On June 15, 2012, I gave verbal orders for
> chemical lab work to be performed for Mr. Jones.]

> [The medical records demonstrate that Mr. Jones was evaluated in the
> chronic care clinic on June 22, 2012 at which time an eye exam was
> conducted.  *Defendants' Exhibit B to the Second Supplemental Special
> Report - Doc. No. 48-2* at 5.  Upon completion of this evaluation, Dr.
> Darbouze determined that no changes in Jones' treatment or medications
> were warranted.]  Mr. Jones was thereafter seen at the health care unit by
> Nurse Rogers [a Licensed Practical Nurse] on July 14, 2012.  Mr. Jones was
> given a physical examination by the nurse and made the following subjective
> complaint: "It is blisters on my toe that hurts.  It is big.  Also the nail fungus
> is back and my toenails are sore.  I would like to know when something is
> going to be done about my left eye.  I cannot see."  [The nurse referred Mr.
> Jones for further evaluation by the medical provider.]

> ... Mr. Jones was [provided prescriptions for various medications on
> July 16, 2012 by Certified Registered Nurse Practitioner Edwards and]

24

thereafter seen by Nurse Practitioner Edwards on ... July 20, 2012 and prescribed medication[] [for the specific complaint voiced to her by Jones during her examination].  [On August 6, 2012, the medical records indicate that Dr. Darbouze examined Jones regarding his complaint of loss of vision in his left eye.  Upon review of  Jones' ocular history and based on his examination of Jones, Dr. Darbouze determined that no treatment or ophthalmology consultation was "indicated at this time."  *Defendants' Exhibit C to the Special Report - Doc. No. 9-3* at 30.]  I personally next saw Mr. Jones on August 28, 2012 when further medications were prescribed.

Mr. Jones had been legally blind in his left eye long before June 8, 2012.  He was not, however, blind in his right eye.  In fact, when seen for his yearly physical exam on May 28, 2011, the uncorrected vision in his left eye was 20/200.  He was referred to the [on site] optometrist, Dr. Bradford, on June 22, 2011, and seen by the optometrist at that time.  On June 22, 2011, the optometrist wrote a prescription for glasses and made no recommendation for Mr. Jones to be seen by any specialist or to have surgery.  Mr. Jones received his prescription glasses on July 8, 2011.

Mr. Jones was again seen by ... Dr. Bradford, on September 5, 2012 at the  Easterling Correctional Facility....  Thereafter, a consultation request was made for Jones to be seen by an ophthalmologist.  The consultation request for an ophthalmologist was approved on September 10, 2012.  Mr. Jones was in fact seen by an outside ophthalmologist on September 14, 2012.  The ophthalmologist was Ram Peddida, M.D., who recommended for Mr. Jones to "see Dr. Bennett for cataract evaluation and surgery right eye."

An MRI of Mr. Jones' brain was taken on September 24, 2012 [showing only age related atrophy and areas that appeared to be small vessel ischemic change].

Mr. Jones saw Dr. Bennett on October 12, 2012.  His impressions [were as follows]:

"(1)  Cataract, Nuclear Sclerosis, OU -- Discussed diagnosis and treatment options in great detail.  Discussed that cataract surgery OS may brighten the vision a little but will not bring vision back to perfect 20/20 vision due to permanent

damage.  Patient voices understanding.  Discussed vision OD was good today and do not recommend doing surgery on only good eye.

   (2)  Ischemic Optic Neuropathy, OS -- Discussed diagnosis with patient in detail.  Advised to keep regular checks with medical physician for checks on blood pressure [as hypertension along with diabetes are the primary causes of Ischemic Optic Neuropathy]."

Dr. Bennett did not advise surgery for either of Mr. Jones eyes.

... Mr. Jones vision problems are not problems that have been caused or exacerbated by any delay in vision care and/or attention.

Mr. Jones was not suffering from an emergency medical condition and the referrals to the optometrist and thereafter to the ophthalmologist [were] done on a timely basis and within the standard of care for physicians practicing medicine in the State of Alabama.

Mr. Jones' vision problems were never ignored, denied and/or delayed by me or any of the nursing staff at the Easterling Correctional Facility.

*Defendants' Exhibit C to the Third Supplemental Special Report - Doc. No. 50-3* at 2-4;

*Defendants' Exhibit A to the Special Report of January 19, 2013 - Doc. No. 37-1* at 3 (In

addressing Jones' claim regarding the treatment she provided, Nurse Edwards states that

she has "no specific recollection of seeing Mr. Jones" on July 20, 2012 but her notes

indicate that during her examination he complained only "of a blister bursting between his

second and third toe on his left foot....  A prescription was written for Mr. Jones for cream

to be applied to the affected area."  Edwards further advises that "[i]f Mr. Jones had made

any reference to vision problems or eye problems, I would have made a notation in the

record regarding Mr. Jones' subjective complaints."). The medical record contains no such notation. *Id.* at 6. Edwards likewise adamantly denies that she told Jones he would have to wait until his release from prison to receive treatment for his eyes. *Id.* at 3-4. This assertion is supported by the record as Jones received treatment from the on-site optometrist and free-world ophthalmologists.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the defendants in addressing Jones' complaints regarding his sinus problems, gastrointestinal issue and sudden loss of vision did not violate his constitutional rights.[4] The medical care Jones received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. The allegations presented by Jones simply fail to establish deliberate indifference by the defendants. *Estelle,* 429 U.S. at 105-107, 97 S.Ct.

---

[4]Although Jones makes the self-serving, conclusory allegation that the X-ray reports compiled by free world radiologists have been altered by the defendants, he presents no evidence to support this assertion. Moreover, after a thorough review of these reports, the court finds no basis for Jones' allegation and, instead, concludes that the findings set forth in these documents have not been altered. In addition, despite Jones' challenges to the alleged falsification of other medical records, he again fails to present any evidence in support of this allegation and his claim is refuted upon the court's review of the records. With respect to Jones' assertion that the MRI report of his brain was irrelevant to his claims and merely submitted as a "ploy" to distract the court, *Plaintiff's Response - Doc. No. 78* at 4, the MRI report reflects that the reason for the procedure was Jones' diagnosis of Ischemic Optic Neuropathy and the decreased vision in his left eye. *Defendants' Exhibit D to the Special Report - Doc. No. 9-4* at 39. Thus, the inclusion of this report by the defendants as an exhibit was both necessary and appropriate. Jones also takes issue with statements made by Dr. Darbouze and alleges that Dr. Dabourze committed perjury when he "stated Jones was blind in his left eye long before June 8, 2012." *Doc. No. 72* at 5. However, this is not the statement provided by Dr. Darbouze in his affidavit as Dr. Darbouze actually stated that "Mr. Jones has been *legally blind* in his left eye long before June 8, 2012." *Defendants' Exhibit C to the Third Supplemental Special Report - Doc. No. 50-3* at 3. It is universally accepted that legal blindness does not refer to complete blindness; rather, it references a substantially limited visual acuity and/or periphery visual field in the affected eye. As for Jones' challenge to the veracity of statements made by Nurse Edwards in her affidavit, the court finds that perjury is not shown merely because her recollection of events differs from that of the plaintiff.

at 292 (The law is well settled that neither malpractice nor negligence is sufficient to establish deliberate indifference.); *Mandel*, 888 F.2d at 787-788 (same); *Adams*, 61 F.3d at 1545-1546 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability.  In addition, an inmate's allegation that prison physicians did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'... to the level of deliberate indifference."); *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Jones received medical treatment for his sinus, gastrointestinal and eye conditions.  It is likewise evident that the defendants rendered treatment to Jones in accordance with their professional judgment.  Moreover, Jones has failed to present any evidence which indicates the defendants knew that the manner in which they provided treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  *Farmer*, 511 U.S. at 837 (Deliberate indifference shown only when

a defendant "knows of and disregards an excessive risk to inmate health or safety." With respect to the knowledge element, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." After making the requisite inference of serious harm, the defendant must then disregard the known "risk of serious harm" to the inmate for deliberate indifference to occur.). The record is devoid of evidence, significantly probative or otherwise, showing that the defendants knew of an excessive risk of harm to Jones and with this knowledge disregarded such risk. Thus, Jones has failed to show that the defendants acted with deliberate indifference to his medical needs. Consequently, summary judgment is due to be granted in favor of the defendants and against the plaintiff. *Carter*, 352 F.3d at 1350.

### B.  Medical Co-Payments

Jones complains that his constitutional rights are being violated by assessment of a $3.00 co-payment for partial payment of costs attendant to medical treatment provided each time he seeks treatment for his sinusitis. *Complaint - Doc. No. 1* at 3. In support of this assertion, Jones argues that assessment of the co-payment for treatment of "a chronic care problem" is violative of Administrative Regulation No. 601 which directs that no co-

payment be charged for chronic care clinic appointments. *Id.*[5]  The evidentiary materials filed by Jones indicate that although he does suffer from acute sinusitis it is not the type of serious medical condition which qualifies for chronic care designation warranting treatment through the chronic care clinic. *Plaintiff's Exhibit A - Doc. No. 1-2* at 15, 17. The defendants maintain and the undisputed medical records indicate that Jones is assigned to chronic care for his hypertension, benign prostatic hyperplasia and gastrointestinal issues and receives treatment through the chronic care clinic for these conditions without assessment of a co-payment. *Defendants' Exhibit D to the Special Report - Doc. No. 9-5* at 2; *Defendants' Exhibit B to the First Supplemental Special Report - Doc. No. 15-2* at 2-3 (emphasis added) ("Mr. Jones is scheduled and seen every ninety (90) days in chronic care. Mr. Jones is not charged a co-pay to be seen on the occasions he is seen in chronic care. The co-pay log [identifying medical treatment subject to a co-payment] is signed ***only when a patient initiates care*** on a body chart or sick call request....  On each occasion that Mr. Jones was seen at sick call, he was seen and evaluated by a nurse, treated pursuant to nursing protocols, and given an appointment with the medical provider if medically indicated.  Each time Mr. Jones is seen at sick call [upon his submission of a sick call

---

[5]Administrative Regulation No. 601 governed medical co-payments during the time relevant to the claims pending before this court.  Under this regulation, the Alabama Department of Corrections charged a $3.00 co-payment for any medical, dental, mental health or optometrist visits occurring in response to a request for treatment submitted by an inmate.  Inmates were not, however, charged a co-payment for visits to the chronic care clinic and medical personnel exerted sole discretion in determining the categorization of health issues necessitating placement in chronic care.  In addition, inmates received medical treatment regardless of their ability to pay the co-payment.  The policy governing medical co-payments is now set forth in Administrative Regulation No. 703.

request] he is charged a co-pay pursuant to Alabama Department of Corrections' protocols. ***Mr. Jones is not charged and has never been charged a co-pay to be seen at chronic care***.").

The charging of a co-payment for medical treatment initiated by an inmate, standing alone, does not violate the Constitution. The mere fact that Jones is charged a nominal fee or co-payment for medical treatment does not in any way deprive him of a protected right, privilege or immunity. *Shapley v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir. 1985) (imposition of fee for medical treatment provided to an inmate does not amount to a constitutional violation); *Bester v. Wilson*, 2000 WL 1367984 at *8 (S.D. Ala. August 18, 2000) ("[T]he charging of a fee to prisoners for medical treatment from their [available] funds has been held to be constitutional when challenged on several due process and Eighth Amendment grounds."). Jones does not allege nor is there any evidence indicating that he was denied medical treatment because he was unable to pay the fee; instead, the evidentiary materials submitted by both Jones and the defendants establish that Jones received medical treatment regardless of his ability to pay a co-payment. Since Jones has failed to allege a violation of his constitutional rights with respect to the assessment/collection of fees associated with medical treatment, the defendants are entitled to summary judgment on this claim.

To the extent Jones alleges that the defendants violated the applicable

31

Administrative Regulation in assessing/collecting the co-payments for medical treatment, this claim likewise entitles him to no relief. Initially, the court notes that the medical records demonstrate that the defendants did not act in violation of the regulation. Moreover, even had a violation of the regulation occurred, the circumvention of departmental rules, regulations or policies does not assert a violation of an inmate's constitutional rights. *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995); *Harris v. Birmingham Board of Education*, 817 F.2d 1525 (11th Cir. 1987).

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment be GRANTED.

2. The plaintiff's motions for summary judgment be DENIED.

3. Judgment be GRANTED in favor of the defendants.

4. This case be dismissed with prejudice.

5. No costs be taxed herein.

It is further

ORDERED that on or before July 21, 2015 the parties may file objections to this Recommendation. Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this

Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 6th  day of July, 2015.


/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE